# JOHN KENNEDY
## *v.*
## THE PEOPLE OF THE STATE OF ILLINOIS.

1. ERROR WILL NOT ALWAYS REVERSE — *of erroneous instructions.* Where a series of instructions embrace the law of the case when taken and considered together, though one of them may be erroneous, still, for such error a judgment will not be reversed, provided it shall appear from the whole record that substantial justice has been done, and no prejudice has resulted by reason of such erroneous instruction, and that the law of the case has been fully given to the jury.

2. INSTRUCTIONS *in a capital case — of their sufficiency as embodying the idea of malice.* An indictment charged a party with having committed a homicide, unlawfully, feloniously, willfully and with malice aforethought. Instructions given for the prosecution required the jury to believe, before they could convict, that the deceased "was unlawfully killed with malice aforethought, in manner and form as charged in the indictment," and that he "was killed in manner and form as charged in the indictment." Both of these forms of expression were held to sufficiently embrace the idea of malice aforethought required by the law to constitute the criminal intent, the former, in express language, and the latter substantially, by reference to the indictment which charged the killing to have been done unlawfully, feloniously, willfully and with malice aforethought.

3. SAME — *as to the mode of expressing the requisite participation of a party in the commission of an alleged crime.* One of several parties charged with having committed a murder, being upon trial, asked the court to instruct the jury that he could not be found guilty unless they believed he "was previously aware of the purpose to commit such murder, or participated therein," to which the court added the words "or aided, or abetted, or assisted in the perpetration thereof." The modification was not improper. The offense charged was thereby brought within the terms and language of the Criminal Code. It is not improper, in an instruction, for the court to use the language of the Code instead of a phrase or word that may, perhaps, have the same meaning.

4. The same party also asked the court to instruct the jury, that if they believed the fatal shot was fired by one of the several persons charged, but from the evidence it was uncertain by which of them it was fired, then they should decide the case as if it were proved the shot was fired by one of the other persons charged, and *they ought to acquit the defendant of firing such shot.* These latter words, "they ought to acquit the defendant of firing such shot," were stricken out by the court, and properly so, as the jury might have understood them to mean that if the defendant was not guilty of actually firing the fatal shot, he was not guilty of murder. The modification left the case

on the true and legal ground. The jury were told they should consider and decide the case as if it had been proved the shot was fired by either one of the other parties charged.

5. IMPROPER ASSERTION OF FACTS *to a jury by the State's attorney, in a criminal case — counteracted by instructions.* Where the State's attorney, in his concluding speech to the jury in a criminal case, improperly asserts his own belief in the guilt of the accused, and asserts facts bearing on the question of guilt which are not in evidence, but in another portion of his speech he told the jury they should acquit unless they believed from the evidence, beyond a reasonable doubt, that the defendant's guilt was established, and the court instructed the jury, that they should disregard any mere assertions of the State's attorney, either of opinion of guilt or matter of fact, but decide the case solely on the evidence and the law, it was *held*, this instruction should be deemed to have had the effect to destroy the force of the improper remarks made by the State's attorney.

6. INSTRUCTIONS — *need not be repeated.* When two instructions are asked for, both of which contain the same principle of law, the court may give the one and refuse the other, and may refuse to repeat a principle of law which has previously been fairly stated to the jury.

WRIT OF ERROR to the Circuit Court of Lake county; the Hon. E. S. WILLIAMS, Judge, presiding.

At the September Term of the Circuit Court of Cook county, John Kennedy, Patrick Fleming and William Corbett were indicted for the murder of one Patrick Maloney. At a subsequent term of that court, on motion of Kennedy, he was ordered to have a separate trial. Corbett and Fleming were tried at the following November Term, and convicted of the crime of murder, and have since been executed. After the conviction of Corbett and Fleming, on petition of Kennedy, there was a change of venue in his case to Lake county, where, on the 6th day of February, 1866, he was tried and convicted of murder, and sentenced to be executed.

The testimony given upon the trial was substantially as follows:

*Honora Maloney*, wife of the deceased, called on behalf of the prosecution, testified as follows: My husband died on Sunday night, before thanksgiving, a year ago, in his own house, in the town of Cicero, near Sand Ridge, in Cook county. He was called tailor Maloney, because he was a tailor by trade.

There was an inquest held on his body the second day after he
was killed, by Dr. Wagner. I went to bed about eight o'clock
on this night, with my husband and children. When we had
been in bed two or three hours a knock came to the side-door;
there was a little entry around the door, and this was broken
into, and the knock came to the side-door. I awoke my hus-
band and told him somebody was knocking at the door. He
got up, and without dressing, lit a light and went to the door
and called out to know who was there. I did not hear the
answer, but soon I heard a noise like a scuffle, and heard him
call out to me to come. I jumped up out of bed, and without
waiting to dress, ran to him, and found him pushing against
the door, which was partly open, and trying to close it against
somebody outside, who were pushing it open. I threw myself
against the door with him, but we could not close it, and in a
minute or two I heard two or three shots fired, and my husband
fell back upon the floor. After the shots were fired, I heard a
person outside say, "That will do, come along." I then went
to the window and saw three or four men passing by; am
certain there were three. My children ran under the bed when
the noise came, and, being frightened, they would not come out,
so I sat down by my husband until morning. He was shot on
the left side of his breast, and died about ten or twelve minutes
afterward. There were two shots fired through the door, but
only one hit him. He was in good health before. Our house
was on the left side of the road coming to Sand Ridge, and four
or five feet from the road. It was only a shanty, about the size
of two large bed-rooms. The next house to ours was about three
blocks off. It was a dark night, cold, blustering and windy.

*Dr. William Wagner*, the coroner of Cook county, testified
that he held an inquest on the body of the deceased, and gave
as his opinion that his death was caused by a bullet taking
effect in the left breast. He testified that the door of Maloney's
house bore the marks of two bullets. He recollected that the
murder took place on the 20th of November, 1864.

*Philip Brenan* testified: I know William Gubbins; I was
in the tavern business and keeping hacks in November, 1864;

I recollect letting a hack one Sunday night; four men came for it; Corbett and Fleming were all I knew; It was quite windy; they said they wanted to take a ride; it was between seven and ten o'clock in the evening; they came back between eleven and one o'clock; on their return, the horses were sweating excessively, and had the appearance of having been driven quite hard; it was a cold, windy night; the driver was William Gubbins.

On cross-examination by the defendant: I kept but one hack; it was in the fall of the year 1864 that I let the hack; I have nothing definite to fix the time; it was a boisterous night, inclined to rain a little, and dark; Gubbins was not at work for me at this time, but I hired him for that time to drive the parties; he came in after the parties hired the hack; it was before the people had closed their houses; they took a drink before going; I had known Corbett and Fleming five or six weeks; during that time they were around that neighborhood; I used to see them often; they drank at my bar; they returned about eleven or twelve o'clock; Corbett and Fleming returned with the hack; can't say whether they all four returned; they paid the driver for the team; Corbett and Fleming came around the next day as usual, and continued to appear around there up to the time of their arrest; they frequented the Olive Branch saloon; they did not appear to have any business; they had the name of being bounty jumpers; never saw the other two men after that night.

*James Finan* testified: I have known the defendant, Kennedy, three or four years; have been intimately acquainted with him nearly two years; in 1864, I was driving team for Whaling & Bowen; did not know Corbett or Fleming; I knew where Maloney lived; he was called tailor Maloney; he lived on Sand Ridge, about six miles from Chicago; one night, while I was driving the team, I went down to the barn to feed the horses, and, after feeding them, as I was going home, I met Corbett, Fleming and Kennedy on the street in Chicago, after dark, on Sunday night; Kennedy asked me if I knew where the Sand Ridge was; I said I did, when Fleming said he had

a sick aunt out there, and he wanted to see her before he left, as he was going away; he asked me to go along and show him the place; I said I could not go, as I had to go out in the morning after a load of hay, and it was too cold to walk out there; Fleming said he would hire a hack if I would go; we then went down on Canal street and went into a saloon, and waited there until the hack came up to the door; Kennedy was with us; we drove down on Polk street and stopped at Sam McNara's saloon; Fleming, Corbett, Kennedy and the hack driver got out and went into the saloon and had a drink; I remained in the hack; when they came out they had a small bottle with them which they put upon the seat and drank out of it several times while going out; each of them drank; they drove on a little further and stopped again, but whether they went into a saloon or not I cannot tell, but they got out of the hack; then they got in the hack and we drove on and did not stop until we got out to Sand Ridge; we went out on West Lake street; after we got out a mile from the town, Fleming asked me how far it was to tailor Maloney's house; I said about three or four blocks; then he called to the driver and stopped the carriage and got out, and Fleming asked me to show them tailor Maloney's house; I went a little way with them and showed them the house, and then I went back to the carriage; Gubbins was with the hack when I came back; I went near enough to the house to see it; they were gone five, ten or fifteen minutes after I came back to the hack; after they came back, Fleming or Corbett said to the driver, "drive on;" Fleming and Kennedy got inside, but Corbett was outside with the driver; they drove on then and came into the city, and I got out a couple of blocks west of Halstead street; the horses were driven in pretty fast; I did not, at the time, know what their business was out there, except that Fleming said he wanted to see his sick aunt; I heard of the death of Maloney the Saturday after the night I went out there; I was one day in Halpin's saloon, in Chicago, the spring following; Mr. Halpin asked me to attend to the house a little time for him, as he wanted to go out; Shortly afterward Kennedy came in and

asked me for something to drink; he was quite well on in liquor, and after drinking, he said to me, "if I knew you would not keep a secret you would not live long;" I never had any difficulty or any dealing with him which he would enjoin me to keep a secret.

*Cross-examination:* Kennedy was a married man; I used to meet him when coming from the barn in the morning, and sometimes in the evening, and sometimes when going to my work. He used to tell me he was at work at the St. Louis depot; he told me a year ago last fall he was working there. I always heard he was married and had a family, but never knew how large, or went to his house. I used to see him very often when I was going to my work. I met Kennedy that night with Fleming and Corbett, about seven or eight o'clock. I was going west when they overtook me, and we went back together. I did not know the other two, but was introduced to them by Kennedy. Kennedy asked me if I knew where the Sand Ridge was, and then Fleming asked me to go with them. I said I did not want to go, and he said that his aunt was sick, and was going away and wanted to see her before he went. I did not hear the conversation about the hack; there was not much said in the saloon while we were waiting for the hack; the three men were drinking, and some others in the saloon at the time. Kennedy was drinking, he was not badly intoxicated; when they came back to the door they said the carriage was ready, and we four drove off to Sam McNara's about a mile, and they all got out and went into the saloon but myself; they came out and brought a bottle with them, and stopped again, but whether they went into the house or not I can't say. They drank two or three times out of the bottle; should think it contained about a pint. Corbett sat outside with the driver when we got out on Lake street. Fleming, Kennedy and myself rode inside; this was when we were going out. Fleming had a revolver and handed it to Corbett; this was the only revolver I saw going out; they were on Lake street when I saw the pistol; nothing was said about it. Don't know what they were talking about on the

way out. I first heard Maloney's name mentioned after we got into the hack; Fleming mentioned it. He asked me where the house was and I told him; I knew where it was. After we got out to the six mile house the hack was stopped by Fleming. I was not called on to give any directions, only when we stopped Fleming asked me to go down the road and show them the house, which I did. Fleming said to me: " Come on, you son of a bitch, and show us the house." I don't know why they stopped about a block and a half from Maloney's house. I don't know why they stopped so far, I did not ask them why. Kennedy got out of the carriage with the rest. I can't recollect any thing he said; did not see him have any kind of a weapon about him; did not notice how drunk he was. I went far enough with them from the carriage to see the house; about half way from the carriage to the house. I did not go further with them because I did not like the company. I did not like the company because Fleming called me a son of a bitch. When I first heard of the murder, I immediately knew that their visit out there had something to do with it. I never mentioned it to any one until the officer arrested me last July. I did not mention it because I was afraid of Fleming and Corbett; they were known to be very bad men. I did not keep it secret because I feared I would be accused, for I was as innocent as a babe unborn. I did not know any thing about what their object was. When we were coming in, Fleming fired a pistol out of the carriage window. I did not hear any pistol shot while they were gone to the house.

*William Gubbins* testified: I remember one Sunday night, in November, 1864, I stopped at Philip Brenan's to see if any of the boys were there; Brenan wanted me to drive his hack that night; I found Fleming and Corbett there; Brenan said they wanted to take a ride; I consented to go; after the carriage was got ready we all took a drink and then they got into the carriage; there were two other men with Fleming and Corbett; I did not know either of them; do not recognize the prisoner as one of them; we drove first up to McNara's, and

they got out there; they took a drink and got a bottle of whisky; from there we went to a place on Harrison street, and then I got my overcoat; we then went up Lake street to the six mile house; Fleming rode on the outside of the carriage with me until we got into Lake street, and then he rode inside; after we got up to the six mile house we turned south and went about a mile, and then stopped; they all got out and Fleming told me to turn the carriage round and blow out the lights; I turned the carriage round, but whether the wind blew out the lights or not I don't know, but they went out; they all went off, and a few minutes after one came back and then the others came back and got into the carriage; Fleming and the two men got inside of the carriage and Corbett got on the outside with me; it was a common covered hack.

The counsel for the prosecution here asked the witness to state what Corbett said after he got upon the seat with him. Answer. After he got upon the seat he said, come, let the horses go along; I said the road was too rough; he said, never mind, let them go; he held a pistol in his hand, resting on the other hand, and said a man that could not play fair ought to die. (This conversation between the witness and Corbett was objected to on the ground that Kennedy was not present; and the court afterward instructed the jury to disregard it.) The witness continued: We drove into town and back to Brenan's; we came in pretty fast.

*Upon cross-examination:* I heard of the murder about a week after it took place; I read it in the paper; I at once knew that the ride out there had something to do with it; I did not tell of it to any one until July last, when my father, who is a member of the police force, wanted me to go down to the police office; I went down there, and saw William W. Kennedy, the captain of the police, and told him all about it; this was after I learned that Fleming and Corbett had been arrested; I did not tell of it before, because, if Fleming and Corbett should know that I "blowed on them," my life would'nt be any thing more in their hands than a chicken's. I did not know that night any thing about what they went out there

for; they were desperate men, and would'nt think any thing of taking any body's life.

*William W. Kennedy testified:* I am captain of police in Chicago; I went with Gubbins and he showed me where his carriage stood that night out near Maloney's; I measured the distance from where the hack stood to Maloney's house, and it was two hundred and fifty yards; I arrested Kennedy, the prisoner, the latter part of July last; he denied all knowledge of the matter.

This was all the evidence, upon which, as before stated, the jury returned a verdict of guilty.

The defendant brings the cause to this court upon writ of error. Among the errors assigned, is that the verdict is contrary to the evidence. Other questions are presented, the grounds of which are set forth in the opinion of the court.

Messrs. Miller, Van Arman & Lewis, for the plaintiff in error.

Mr. Charles H. Reed, State's Attorney, for the people.

Mr. Justice Breese delivered the opinion of the Court:

This was an indictment found in the Superior Court of Chicago against the plaintiff in error, and two others, for murder. A separate trial was allowed the plaintiff in error, and a change of venue awarded on his application, to Lake county, where a trial was had resulting in a verdict of guilty.

A motion was made to set aside the verdict and grant a new trial on the grounds, that the court had misdirected the jury, and that the verdict was against the evidence and law of the case.

The motion was overruled and exceptions taken, and the cause brought here by writ of error on a bill of exceptions. The errrors assigned are in giving the third, fourth and fifth instructions on behalf of the people, in refusing to give defendant's third and seventh instructions, and in modifying the same, and in refusing defendant's ninth instruction, and in overruling the motion for a new trial.

The prisoner's counsel has confined himself chiefly to the consideration of these instructions.

A series of instructions was given for the prosecution, and are as follows:

1. The court instructs the jury, that "murder is the unlawful killing of a human being in the peace of the people, with malice aforethought, either express or implied."

2. And the court further instructs the jury, that *malice aforethought shall be implied* when no considerable provocation appears, or when all the circumstances of the killing show an abandoned and malignant heart.

3. The court further instructs the jury, that if they believe from the evidence beyond a reasonable doubt that Patrick Maloney was unlawfully killed with malice aforethought, in manner and form as charged in the indictment, and this defendant, John Kennedy, was present, and in any way or manner aided, abetted or assisted in such killing, then the jury should find him guilty, although the jury may believe from the evidence that some other person actually fired the shot that killed said Maloney, and although no motive for killing said Maloney has been proved.

4. The court further instructs the jury, that a *reasonable doubt means in law a serious, substantial* and *well-founded* doubt, and not the mere possibility of a doubt.

5. The court further instructs the jury, that if the evidence convinces you beyond a reasonable doubt that Patrick Maloney was killed in manner and form as charged in the indictment, and that this defendant, John Kennedy, was present, and in any way or manner aided, abetted or assisted in such killing, then the jury should find him guilty, although there was no eye-witness to the fact of such killing.

6. The court instructs the jury, that voluntary drunkenness is no excuse for crime.

This court has often held where a series of instructions embrace the law of the case when taken and considered together, though one of them may be erroneous, still, for such error a judgment will not be reversed, provided it shall appear from

the whole record that substantial justice has been done, and no prejudice has resulted by reason of such erroneous instruction, and that the law of the case has been fully given to the jury. *Howard Fire & Mar. Ins. Co.* v. *Cormick*, 24 Ill. 455; *Warren* v. *Dickson*, 27 id. 115; *Springdale Cemetery Association* v. *Smith*, 24 id. 480.

The counsel for the plaintiff in error insists, that the third and fifth of these instructions are erroneous, for by them the jury were directed, that if they found from the evidence, that Maloney was unlawfully killed in the manner alleged in the indictment, and that the prisoner was present, and in any way or manner aided, abetted or assisted in such unlawful killing, then they should find him guilty of murder, although the jury believe, from the evidence, that some other person fired the fatal shot, and although no motive is proved, and there was no eye-witness of the deed.

It is argued, that, upon this supposed state of facts, the person who actually committed the homicide would be guilty of no higher offense than manslaughter, because no malice aforethought is assumed or supposed to have been proved; or is required to be found by the jury, and without malice aforethought, unlawful killing is manslaughter only, and if the prisoner was present, aiding and assisting, he could not be guilty of any higher crime.

We do not think either of these instructions is open to the objections made.

The indictment charges the homicide to have been committed unlawfully, feloniously, willfully, and with malice aforethought, and our Code provides, that malice shall be implied when no considerable provocation appears, or when the circumstances of the killing show an abandoned and malignant heart.

In both the third and fifth instructions the jury are told, that the killing must have been with malice aforethought, in manner and form as charged in the indictment—in the third instruction in express terms, and the fifth tells the jury, in substance, that they must be convinced beyond a reasonable doubt, that deceased was killed in manner and form as charged

in the indictment, that is, that he was killed unlawfully, feloniously, willfully, and with malice aforethought.   As we understand these instructions, and as the jury must have understood them, they were told the prisoners must not be convicted unless the homicide was done with malice aforethought.

The killing being established, in manner and form as charged in the indictment, it requires, on the evidence in this record, no argument or other authority than a bare reference to the statute, section thirteen of the criminal Code, to fasten guilt upon the prisoner.   The proof is positive, that he was present when the deed was done, and that he had a guilty knowledge of the design in visiting the house of the deceased sufficiently appears from all the circumstances.   The prisoner seems to have been, not a sleeping partner, but an active participant. He engaged the guide to the house, and introduced him to his guilty associates, and was " act and part " in the whole murderous affair from its inception to its fatal termination.   It is impossible, in the nature of things, he should not have known the design and object of the visit, of a cold night in November, armed with a revolver, to the shanty of deceased..

The deed, perpetrated in the manner it was perpetrated,. sufficiently establishes malice, and all the facts show a guilty knowledge and participancy of the prisoner.

On his behalf, the court told the jury, that the mere presence of the prisoner at the homicide, was not sufficient to convict him unless it was proved to their satisfaction that he knew before the killing that such was the purpose of those who actually did the deed — that they must be satisfied he was not only present, but aware of the purpose.   The objection of his counsel, therefore, that the prisoner had not the full benefit of his defense, seems not to be sustained.   His mere physical presence was not deemed sufficient to establish his guilt, but it was held to be necessary to show previous knowledge of the intention to commit the murder.

We are at a loss to perceive wherein the prisoner has been prejudiced, improperly, by these several instructions of the court.

But it is further insisted, the seventh instruction as asked by the prisoner, was proper, and should have been given without any modification.

That instruction was as follows : " Though the jury shall believe from the evidence, that the murder was committed at the time and place mentioned in the indictment, still, if they are not satisfied, from the evidence, that the prisoner was previously aware of the purpose to commit such murder, or participated therein, then they should not find the prisoner guilty, though they further believe from the evidence that he subsequently failed to disclose or actually concealed such murder."

The modification by the court consisted in inserting, after the words " participated therein," the words " or aided, or abetted or assisted in the perpetration thereof," before the words " then they should not find," etc.

We perceive no impropriety in this modification, but the contrary ; as, by the insertion of those words, the offense charged was brought within the terms and language of the Criminal Code. The language of the Code is, " aids, abets or assists," and it cannot be charged as improper, in an instruction to the jury, that the language of the Code was used by the court instead of a phrase or word, that may, perhaps, have the same meaning.

The jury, by the instructions on both sides, were clearly told, that the prisoner ought not to be convicted unless it should be proved to them beyond a reasonable doubt, that he .was aware of the intention to commit the murder, and that he participated in such intention, and that the concealment of a murder was not equivalent in law to the commission of that crime.

The third instruction asked by the prisoner, which the court also modified, was as follows :

" If the jury should find, from the evidence, that the deceased was killed at the time and in the manner mentioned in the indictment, and that the shot which caused his death was fired by either Corbett, Fleming or the defendant, but are unable, from the evidence, to ascertain by which of said persons said

shot was fired, then the jury ought to acquit the defendant of firing such shot, and consider and decide the case precisely as if it had been proved that such shot was fired by Corbett or Fleming."

The court modified this instruction by striking out the words "acquit said defendant of firing such shot." The instruction was ingeniously drawn, and might have led the jury to believe, if the prisoner was not guilty of actually firing the fatal shot, he was not guilty of murder. The modification by the court left the case on the true and legal ground, and relieved the jury from all embarrassment, such as they might have experienced had the words remained which the court expunged. We see nothing objectionable in the modification. The jury were told they should consider and decide the case precisely as if it had been proved such shot was fired by either one of the other parties indicted.

It is also objected by the prisoner's counsel, that the State's attorney, in his closing address to the jury, stated to them his own belief of the prisoner's guilt, and informed them that Corbett and Fleming had been convicted and sentenced for the murder, and that the prisoner was as guilty as either of them, and that his acquittal would be an impeachment of the jury that tried them.

Whatever may be said of these remarks by the State's attorney, it further appears in the record, that he did, in another part of his closing speech, tell the jury that they ought to acquit the prisoner, unless they believed, from the evidence, beyond a reasonable doubt, that his guilt was established, and the court further told them, by the eighth instruction asked by the prisoner, that they should disregard any assertion of counsel of the existence of any fact bearing upon the question of the guilt of the prisoner, which has not been proved before them, and which is not fairly inferable from the facts proved; nor should the jury regard any expression of opinion by the prosecuting attorney as to the guilt of the prisoner, but the jury will determine the question of his guilt or innocence

solely from the evidence in the case, and the law, as given by the court.

This instruction certainly had the effect to destroy the force of the remarks made by the State's attorney and remitted the jury to their duty, to be governed solely by the evidence in the cause and the law of the case.

The last paragraph of this instruction after the word "pris- oner," was inserted by the court, to which modification the record does not show the defendant took any exception. This being so, no error can be assigned on it. *Sedgwick* v. *Philips*, 22 Ill. 184.

It is also objected that the court refused to give the ninth instruction for the prisoner. It is as follows:

"The jury should not regard the statements of the prosecuting attorney, that Fleming and Corbett have been convicted of the offense for which the prisoner is now on trial; and this statement should have no weight whatever in the case."

This instruction is substantially the same as the eighth after it was modified, and which was given as modified. In the case of *May* v. *Tallman*, 20 Ill. 443, this court said, when two instructions are asked for, both of which contain the same principle of law, the court may give the one and refuse the other, and may refuse to repeat a principle of law which has previously been fairly stated to the jury.

Upon the motion for a new trial, we are of opinion that the evidence fully sustains the verdict, and makes out a clear case against the prisoner. Had his presence at the scene of the murder been innocent, he would not have denied all knowledge of it, but would have used the proper means to bring the guilty to punishment. The facts are plain and striking, and show his active participation in the affair, from the time he introduced the guide to Corbett and Fleming, and accompanied them on the murderous expedition. We see nothing in the evidence to raise a doubt of the prisoner's guilt, and see no error in any of the rulings of the court, and must, therefore, affirm the judgment.             *Judgment affirmed.*