## TERRITORY *v.* O'DONNELL.

*(Supreme Court of New Mexico.* January 27, 1887.)

1. CRIMINAL LAW—APPEAL—EXCEPTION NOT PROPERLY TAKEN—INSTRUCTIONS.
   Where the record fails to show any objection or exception to the instructions of the court, taken in the trial court, an exception to the charge, taken for the first time in the supreme court on appeal, will not be considered.

2. SAME—TRIAL—INSTRUCTIONS—REQUEST.
   Where a party is not satisfied with the instructions given on any point, he must offer a proper instruction covering that point.

3. SAME—INTRODUCTION OF EVIDENCE—REBUTTAL.
   The admission of evidence in chief after the defendant has closed his defense is a matter purely in the discretion of the court, and will not be reviewed on an appeal, especially if the defendant is permitted, after the introduction of such testimony, to rebut it.

4. SAME—APPEAL—INSTRUCTIONS—REMARKS TO COUNSEL—WARNING TO JURY.
   Where the trial judge makes remarks to counsel during the progress of the trial, in the presence of the jury, expressing an opinion on the weight of portions of the evidence, but afterwards warns the jury that these remarks were made to counsel, and were not intended to be heard or regarded by them, and that they should disregard them, and determine the cause solely upon the evidence, and the instructions of law thereafter to be given, the caution and warning rob the remarks of their objectionable character, and the supreme court will not reverse the judgment, on appeal, because of them.

5. SAME—LANGUAGE USED BY JUDGE—TONE OF VOICE—MANNER.
   On appeal, the court can only consider the language used by the trial judge, and cannot consider the tone of voice, the manner in which the remarks were made, and the effect produced upon the jury thereby.

6. HOMICIDE—INDICTMENT—MURDER—FIRST DEGREE.
   An indictment for murder in the first degree need not charge the defendant with the crime *in hæc verba,* but is sufficient if it charges him with that crime, setting forth all the facts necessary to constitute it with great particularity, and with all the qualifying words used in approved precedents.

7. APPEAL—WEIGHT OF EVIDENCE—PROVINCE OF JURY.
   The jury are the sole judges of the weight of the evidence and the credibility of the witnesses.

Appeal from Third district court, Grant county.

*Fielder & Fielder,* for appellant.    *Wm. Breeden,* Atty. Gen., for the Territory.

BRINKER, J.    The defendant was convicted of murder in the first degree for the killing, on the third of October, 1885, of Sergeant Alonzo Bowman. The following is the substance of the evidence:

Dr. Hubbard testified that he was a surgeon in the army, stationed at Fort. Bayard, and that on the third of October he was called upon to attend the deceased, at Central City. He reached him about half past 12 o'clock at night; found him suffering from a gunshot wound through the neck. He died within 23 hours after he was shot, from the effects of the wound with which he was suffering. The course of the ball passed behind the trachea or wind-pipe and carotid artery and jugular vein, and tore through the smaller arteries, and cut across the cords of the neck. He bled to death. After his death the witness removed a section of the spinal column, and found that death resulted from the hemorrhage caused by the gunshot wound. Deceased was a sergeant in Troop L, United States cavalry.

Salome Gonzales, who resides at Silver City, testified "that she was in Central City on the day of the killing, and was present when the deceased was shot, and in the same room. She stated that defendant came into the door that opens into the saloon; that deceased was in the room with her [witness] and another woman. There were two bedsteads in the room, and deceased and the other woman were sitting on one of the beds. When defendant came in witness stated that she was washing her face at the table.

Defendant opened the door, and came in, and said, 'Are you here?' and then fired the shot, which hit deceased in the neck."

Maggie Hays, another witness, who at that time resided in Central City, states "that she was present in the room where deceased was killed; that defendant knocked at the door, and Salome opened it. Defendant came in, and said, 'You are here;' and fired, and shot Sergeant Bowman in the neck. This was in a room at Mike Cary's house. Deceased made no reply to the remark of defendant. The shot was fired immediately after the remark was made. At the time the shot was fired deceased was sitting on the bedstead by the side of the witness. This occurred in the room which opens into the dancehall. When defendant came into the door, and made the remark mentioned, he drew a pistol from his pants, and fired at deceased."

James Sullivan, another witness, testified that he was a member of Troop L of the Sixth cavalry of the United States army, a private; that he knew the defendant by sight, and had known him for three months, and had known the deceased a little over a year. The witness was not present at the shooting, but was present and heard a conversation which took place between the deceased and defendant the day before the shooting, at the company's head-quarters at Fort Bayard. They were talking about a woman. Deceased said he was going to stay with the woman. Defendant said he would bet deceased that he could not stay with her. Deceased said: "Wait until night, and after we get our pay I will let you know whether I can stay with her or not." Defendant then said to witness that if deceased ever bothered that woman he would kill him. The woman is called Bud Hays' wife. Witness pointed out Maggie Hays as the woman. This conversation occurred at Fort Bayard, and the shooting took place at Central City, which is a little over a mile from Fort Bayard. Deceased and defendant were sitting down when the conversation occurred about the woman. Deceased then got up, and left, and defendant remained seated about 10 minutes or more after deceased left. Witness did not communicate to deceased what the defendant said. This conversation occurred about 9 or 10 o'clock on the day before the killing. Witness was friendly to both deceased and defendant. The conversation between the deceased and the defendant about the woman was carried on in a friendly manner. Did not know whether they were friends or not.

James Lane testified that he was at Cary's place, on the porch, when defendant passed, and went into the house. He immediately afterwards heard a shot fired, and ran in to see what was the matter. Found the deceased on the floor; picked him up; put him on the bed; asked him if he had any statement to make; deceased could not speak. Witness then went out on the porch. Saw defendant lying on the porch, crying like a baby, saying he had shot the best friend he ever had in the world, accidentally.

William Wilson testified that he lived at Fort Bayard; was trumpeter in the United States army; that, shortly before the homicide,—one or two days, —he, deceased, and defendant were in Cary's saloon. Witness said to defendant, (referring to deceased:) "I would like to be in that man's boots, because he will be a free man in about three weeks. His time in the service will be out then, and he will be free." Defendant said: "If he don't keep away from a certain woman, he will wish to God he was not;" that "he would not be a free man." Witness, on being asked to whom the defendant referred, stated he did not know; that defendant said "if he didn't keep away from a certain party in town he would not live to see his time out." Witness didn't remember how many persons were present besides himself, deceased, and defendant. Witness did not communicate these remarks to deceased. Defendant made the remark in "a hang-dog" or sullen manner. Witness was friendly both to deceased and defendant.

Lewis Elliott, on the part of the defendant, testified that he resided in Central City, and had for about three months on the day of the shooting. Was

managing a restaurant in Mike Cary's saloon. Was acquainted with defend-
ant slightly. Was not acquainted with deceased. At the time of the shoot-
ing, witness was in the kitchen getting breakfast for the defendant. When
defendant came in he came to the kitchen and ordered his breakfast. This
was about 9 or 10 o'clock in the morning. Defendant said to witness:
"When you get my breakfast, call me." He then asked witness if there were
any women in the room. Witness told him he thought there were. Defend-
ant then went into the room. Witness heard a shot, and in three or four
seconds heard the defendant say: "My God! I have shot my friend." In
about a minute after the shot was fired, Judge Givens came to the door,
and called witness to pick up the deceased, and put him on the bed. De-
fendant and witness picked up the deceased, and placed him on the bed. De-
ceased commenced to gasp after they put him on the bed. Then the defendant
gave way, and laid down on the other bed for perhaps 10 seconds. He then
laid down on the bed where the deceased was, and put his head on deceased's
breast, and became covered with blood. He then rolled over behind deceased
on the bed, and soon fell on the floor. Joe Donnelly then came in, and wit-
ness noticed defendant was breathing heavily, like he was choking. Witness
and Donnelly took a silk handkerchief and a piece of paper out of his throat.
They choked the paper out of his mouth. Witness smelled something scorch-
ing, and saw a hole in defendant's pants on the right side of the waist-band,
between the first and second suspender button. It looked like a bullet hole.
It was scorched on the inside. Donnelly helped witness take the defendant
out of the room, and take the stuff out of his mouth. The hole in defend-
ant's pants was perhaps three-quarters of an inch in diameter, on the right
front side, at the upper edge of the waist-band. Witness first discovered this
hole in defendant's pants five or ten minutes after the shot was fired. When
they noticed defendant on the floor, he was struggling and moaning. They
dragged him out to the dance-hall, and, after hard work, got the paper and
handkerchief out of his mouth. The roll of paper was oblong, and about an
inch to an inch and a quarter in diameter. Witness squeezed the paper out
of defendant's mouth by running his finger along his gums, and pried his jaws
open.

Thomas Jennings, witness for the defendant, testified that he was ac-
quainted with the defendant, and had been for eight months; had been ac-
quainted with deceased for 10 years in the army; that he knew Salome Gon-
zales, a witness for the territory; that between the fifteenth and twenty-fifth
of November, 1886, he had a conversation with her in Mrs. Cary's dance-
house, in Central City, and in that conversation she said that defendant was
a dirty, low-down cavaron, and if her word would go, and she could make it
stick in court, she would hang him. Witness saw defendant in charge of the
officer after the shooting. Defendant asked witness to lift up defendant's
coat; that he (defendant) came near killing himself. Witness looked at the
coat, saw it was powder-burnt, and saw a round hole in the waist-band of
defendant's pants. The hole was about the size of a quarter or half dollar.

James Thompson, witness for the defendant, testified that he was ac-
quainted with the defendant; was not acquainted with the deceased; that he
saw defendant about 3 o'clock in the morning before the killing; that defend-
ant had a pistol which belonged to witness, and which witness had loaned
him 10 or 15 days before. The pistol was a 45-calibre, octagon barrel. Wit-
ness always considered the pistol tricky. Sometimes it would stand half-
cocked; sometimes it would not. When defendant came into the saloon of
witness, he and witness went to bed together. Before going to bed, defend-
ant laid the pistol on the stand. He had six cartridges in it. Witness told
him he was foolish to carry it around loaded in all chambers. Witness then
took one of the cartridges out, and placed the hammer of the pistol on the
empty chamber. Next morning witness got up about sun-up. Defendant

slept until 9 or half past 9 o'clock. Witness didn't see defendant any more until after the shooting. On Monday morning, after the shooting, defendant called witness to one side, and told him about the shooting, and showed him a hole in his (defendant's) pants, which he said was made when the shot went off.

Joe Donnelly, witness for defendant, testified: Lived in Central City. Was acquainted with deceased and defendant. Immediately after the shooting he was told that defendant had shot deceased. Witness went to the house, and went to the room where the shooting occurred. Saw deceased lying on the bed, and defendant lying on another bed. Deceased was gasping, and wanted to be raised up. Witness assisted some one else in raising him up, and placing a pillow under his head. Witness then discovered defendant under the bed, stretched out, with his face to the floor. Witness told him to get up and get out of there. Receiving no answer, he then heard defendant sobbing and moaning, and noticed a kind of choking sound in his throat. Lewis Elliot then dragged him out to the dance-hall, and witness put his hand in defendant's mouth, and pulled out a silk handkerchief, after much difficulty. Witness noticed that that didn't relieve defendant; that he was getting black in the face. Defendant commenced coughing. Witness put his fingers down defendant's throat, and pulled out a newspaper. Witness saw nothing of a hole in defendant's pants.

O. F. Jay, a witness for defendant, testified that he knew William Wilson, one of the witnesses for the territory; that about three weeks before the trial he heard Wilson say of defendant: "I am going to see that the son of a bitch is hung. I have a grudge against him. I will do all I can against him." Wilson was drunk at the time. Witness knew Maggie Hays. About two weeks before the trial Maggie Hays stated, in the presence of witness, that defendant, at the time of the shooting, had the pistol by his side, trying to put it into his pants, when it went off.

Ed. Hawkins, a witness for the defendant, testified that he knew William Wilson. Witness was present at the conversation with Wilson testified to by Jay, and heard Wilson say that he (Wilson) had a grudge against defendant, and now he thought he had a chance to get even with him.

Defendant was sworn as a witness in his own behalf, and testified that he knew deceased; that the night before the killing he (defendant) was up nearly all night; that he and deceased were at a dance together that night; danced in the same set; took several drinks together. Defendant went to Thompson's saloon about 3 o'clock. Went to bed. Before going to bed he laid the pistol on the table. Thompson told him he was a fool; that he was liable to kill himself with that pistol, with six loads in it; that it was a treacherous pistol, and would not stand half-cocked. Defendant then went to bed. Slept until 9 o'clock next morning. Got up, washed, and got ready for breakfast. Went into Mike Cary's saloon; then through the saloon into the kitchen, and ordered his breakfast. Asked the cook if there were any women in the other room. Cook said there were. Defendant heard some women talking in there a little while before. He then ordered his breakfast. Told the cook when he got it ready to call him. Then started towards the room where the women were. Before he got to the door of the room he put his hand in his pocket to get a match to light a cigar. He was then near the door of the room. When he put his hand in his pocket he felt the cartridge that had been taken out of the pistol when he went to bed. He took the cartridge out of his pocket; opened the side-piece of the pistol, put the cartridge in the chamber; that in inserting the cartridge he must have pulled the hammer clear back, without knowing it. He knocked at the door. One of the women opened it. As the door was opened, he had the pistol in his hand, and was in the act of putting it in his pants, when it went off. For a second he didn't know what to think, or what was the matter. He then put the pistol in his pocket. Started over

to where deceased was sitting on a low bed. When he got half way to deceased, deceased fell off the bed. Then defendant exclaimed, "My God! I have shot the best friend I have in the world;" and asked deceased what was the matter with him. Deceased told him to put him on the bed. Defendant tried to put deceased on the bed, but could not. He then got help, and put him on the bed. He then discovered the wound in deceased's neck. Judge Givens was the first man to come into the room after the shot was fired, and defendant handed Givens his pistol, and told him he had shot the best friend he had on earth, accidentally. After defendant saw the wound it shocked him so that he gave way, and knew nothing of what took place afterwards until he found himself lying on Cary's porch; that he carried the pistol because he had been threatened with violence by a man named Hutchinson; that he and deceased were the very best of friends. Defendant denied the conversation testified to by the witnesses Wilson and James Sullivan. At the time of the shooting defendant was trying to put the pistol inside of his pants, under the waist-band, when it fired accidentally; that in putting the pistol inside of his pants he inserted the muzzle first, and then undertook to put the balance of the pistol underneath his pants, by pressing the cylinder and the handle downward. This brought the weapon into nearly a horizontal position, and in this position the shot was fired.

Maggie Tuttle, a witness for defendant, testified that Hutchinson told her he would kill defendant, and she informed defendant what Hutchinson said.

J. Crockett Givens, a witness for the territory, in rebuttal, testified that he was present at the house of Cary on the day of the shooting. He was not in the room where the shot was fired, but in another portion of the house. He heard the shot, and immediately went to the room where it was fired. Saw deceased lying on the floor. Defendant was standing near deceased's head. Defendant had a pistol in his right hand. Witness got hold of the pistol, and took it away from defendant before defendant knew he was in the room; that when defendant first came to the house he came into the bar-room; that defendant didn't go to the kitchen, but went directly from the bar-room to the room where the shooting occurred. Witness followed him. Defendant passed into the room, and shut the door, and immediately a shot was fired. When witness got into the room he found defendant, Maggie Hays, Salome Gonzales, and deceased. Maggie was standing in the door, on the south side of the room. Deceased was lying on the floor, with his left foot on one of the beds. Defendant was standing over deceased, near his shoulders and head. Salome was standing near a large bed near the door where witness entered. When witness took the pistol away from defendant it had one empty shell in it and five loads.

Dr. Hubbard testified, on rebuttal, for the territory. This witness described the wound and the course of the ball. He said the ball entered the middle of the neck, on the right side. The general direction of it from the point of entrance to the point of exit was downward and forward. Its exit was further towards the front of the neck than its entrance. The day after the shooting, and while the defendant was in the guard house, witness had a conversation with him about the killing. Witness said to defendant, "What on earth did you shoot Sergeant Bowman for?" Defendant replied: "I don't know. I came into Mike Cary's saloon, and inquired if any one was in the room. I was told that two girls were in there. I went in, and found Bowman in there. I said to him 'Dogon your skin, are you here?' I then hesitated, and drew my pistol, and shot him, not knowing what I did." "I had no motive in killing him, because he was my friend." The witness also testified that when he first saw deceased his face was powder-burnt.

Maggie Hays was recalled, and testified that defendant was about four steps from deceased when the shot was fired; that the bed on which the deceased was sitting was two feet and a half high. This witness denied the conversa-

tion testified to by Jay; and stated that what she said to Jay was that defendant drew the pistol from his side, pointed it at deceased, and fired.

Salome Gonzales testified, in rebuttal, for the prosecution, that she saw the pistol when it was fired; that she didn't see it until it was drawn and fired; that defendant held it out, and shot it off.

Defendant was then permitted to take the stand, and denied the conversation testified to by Dr. Hubbard.

Idus L. Fielder, attorney for defendant, testified that Maggie Hays told him that, at the time of the shooting, defendant had the pistol down by his side when it went off.

To reverse the judgment, defendant contends that the court erred in giving improper instructions to the jury; in refusing to give proper instructions requested by defendant; in permitting testimony descriptive of the wound, and the course taken by the ball with which deceased was killed, to be introduced by the prosecution after the evidence for the defense was closed; in expressing an opinion, in the presence of the jury, upon certain portions of the evidence, to which exception was taken; in overruling the motion in arrest of judgment; in refusing to set aside the verdict, because, as alleged, it is not supported by the evidence.

The record fails to show any objection or exception to the instructions. "Exception to the decision of the court, upon any matter of law arising during the progress of the cause, or to the giving or refusing of instructions, must be taken at the time of such decision." Section 2197, Comp. Laws. This section is found under the head of "Civil Procedure" in the Compilation 1884; but a reference to the original act will show that it was not intended to be limited to civil causes. The act is entitled "An act to regulate the practice in the district court," approved March 1, 1882. Acts 1882, *c.* 4, p. 19, § 5, is the section quoted above as section 2197, Comp. Laws.

In the case of *Territory* v. *Yarberry*, 2 N. M. 391, decided in 1883, it was said, on page 454: "The prisoner, by his counsel, excepts to each and every part of said charge, and does not except to any particular error of law in said charge. Our rules require that he should specify distinctly the several matters in law to which he excepts; otherwise this court will not consider such general exceptions." Yarberry was indicted, tried, and convicted of murder in the first degree, in May, 1882, after the act *supra* had gone into effect, and we must presume that, when the court say the rules require that the exceptions must be distinctly specified, it had in mind the law then in force, and the rules of practice prescribed by that law.

In *Leonardo* v. *Territory*, 1 N. M. 291, decided in 1859, the court held a law which provided "that, in any suit in the district court, the judge should give his instructions to the jury in writing only," to apply to criminal as well as civil causes. The court in that case also say that the objection to the charge cannot be considered, unless the record shows it to have been excepted to when delivered. The section under consideration is but the legislative adoption of a familiar rule, which has been universally observed, in both civil and criminal cases.

In *Martin* v. *People*, 13 Ill. 341, Judge TRUMBULL, speaking for the court, says: "The only way for a party to avail himself in this court of objections to instructions in the court below is to except to the decisions of the court, in giving or refusing them, at the time they are made." To the same effect are the following cases: *Kennedy* v. *People*, 40 Ill. 488; *Sedgwick* v. *Phillips*, 22 Ill. 184; *Leigh* v. *Hodges*, 3 Scam. 15; *Hill* v. *Ward*, 2 Gilman, 285; *State* v. *Miller*, 23 Minn. 352; *Com.* v. *Child*, 10 Pick. 252; *State* v. *Hascall*, 6 N. H. 360; *Kolle* v. *Foltz*, 74 Ind. 54; *Garroll* v. *Young*, 22 Ind. 270; *Hyatt* v. *Clements*, 65 Ind. 12; *Griffin* v. *Pate*, 63 Ind. 273; *Railroad Co.* v. *Parker*, 73 Ill. 526; *Gibbons* v. *Johnson*, 3 Scam. 61; *Williams* v. *Thomas*, 9 Pac. Rep. 356;[1] *Coleman* v. *Bell*, *ante*, 46,[2] (decided at this term;) *U. S.* v. *Breitling*, 20 How. 252; *Murray* v. *State*, 26 Ind. 141; *Wood* v. *Weimar*, 104 U. S. 786.

[1] Same case, 3 N. M. 324.    [2] Same case, 12 Pac. Rep. 657.

These citations might be greatly multiplied, but the above are sufficient to show that the rule prescribed in the statute is so well known that an omission to except to the giving of the instructions at the time must be held as indicating entire satisfaction with such instructions, and as precluding any exception to them for the first time here.

The position that the court refused proper instructions requested by defendant cannot be sustained, for the very sufficient reason that the record shows that the court gave all the instructions asked by him.

But it is insisted that the court should have given instructions covering the theory of defense adopted by defendant. The instructions given presented the case fairly to the jury, and if defendant was not satisfied with those, and desired any particular point presented to the jury prominently, he should have offered a proper instruction covering that point. Thomp. Char. Jury, § 81, and cases cited; *Express Co.* v. *Kountze,* 8 Wall. 343.

There was no error in allowing the prosecution to introduce evidence in chief after the defendant closed his defense. That was a matter purely in the discretion of the court, and cannot be reviewed. 1 Greenl. Ev. § 341. But, if this were not so, defendant cannot complain, because the court permitted him, after this testimony was introduced, to rebut it.

Defendant complains of remarks made by the trial judge to counsel, during the progress of the trial, in the presence of the jury, expressing an opinion upon the weight of some portions of the evidence. The record shows that certain remarks were made which, if the jury had not been warned against, we should hold were error. But the court said to the jury that those remarks were made to counsel, and were not intended to be heard or regarded by them, and that the jury should disregard them, and determine the case solely upon the evidence, and the instructions of law thereafter to be given them. This caution and warning, we think, robbed the remarks of their objectionable character. To hold otherwise would be to subject the administration of justice to the peril of being obstructed by every unguarded utterance made during the progress of a trial, even though it was withdrawn, as in this case, at once, and its effect removed by prompt and proper admonition to the jury to ignore it.

But counsel say that, while the record may disclose the language used, it cannot give the tone of voice nor portray the manner in which it was said, nor its effect upon the jury. This argument is not new. It was used as long ago as 1829. In *Com.* v. *Child,* 10 Pick. 253, PARKER, C. J., in answering it, said: "It is said the tendency of the judge's remarks was to affect the jury unfavorably to the defendant's side of the case. The next step will be to move for a new trial on account of the expression of countenance of the judge. These things, if evils, are unavoidable. Confidence must be reposed in the integrity of the judge. If an unjust partiality is shown, the remedy must be in one of the modes pointed out in the constitution. Though an undue influence may be exerted upon the jury by the manner of the judge, yet the law presumes intelligence in the jury; and, if they perceive any improper attempt of the kind, they will be more likely to find a verdict against the opinion of the judge than in accordance with it. * * * If the evidence in such case does not sustain the verdict, a new trial will be granted."

The motion in arrest of judgment was properly overruled. The indictment was well enough. It was drawn after the form which has been sustained by all courts of common law for ages. The contention that it did not charge the defendant with murder in the first degree *in hæc verba* is untenable. It did charge him with that crime, by setting forth all the facts necessary to constitute it with great particularity, and with all the qualifying words used in approved precedents.

The evidence was conflicting, but was sufficient to sustain the verdict, if true, and its truth or falsity was a matter to be determined by the jury. They

were the sole judges of the weight of the evidence, and of the credibility of the witnesses, and, if they believed from the evidence that any witness had sworn falsely, they could disregard his testimony. In determining what weight should be given to the testimony of the witnesses, the jury could consider their manner and conduct in court, means of knowledge, character, habits of life, and, in fact, any other matter surrounding the witnesses, likely or calculated to influence them one way or the other. Nearly every witness sworn in the case was contradicted by some other witness, and, while there was no effort made to impeach any of them by evidence of general reputation, it seems to have been taken for granted that the two women were prostitutes. This fact was proper for the consideration of the jury in passing upon their credibility, but the jury was not bound to disregard their testimony on that account. The evidence would have justified a verdict of conviction or acquittal, but for us to say which it should have been would be an invasion of the province of the jury. The testimony for the territory, if believed, showed a most wanton and unjustifiable murder, committed after most thorough and cold-blooded premeditation, arising from the reflection that defendant had been supplanted in the unholy affections of an abandoned woman, whose wares were upon the market for all who were base enough to give her patronage. It follows that there was no error in denying the motion for a new trial. The judgment must be affirmed, and the proper officer directed to carry it into execution.

LONG, C. J. I concur.